FILED
KENNETH J. MURPHY
CLERK

03 OCT 28  AM 10: 25

DIST COURT
WEST'N OHIO
CINCINNATI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MATT LEHRFELD | * | CASE NO. C-1-01-432 |
| PETITIONER | | |
| | * | JUDGE DLOTT |
| - vs - | | |
| | * | MAGISTRATE JUDGE SHERMAN |
| JEFFREY WOLFE | | |
| RESPONDENT | * | |
| | * | |

---

## PETITIONER'S OBJECTION TO MAGISTRATES REPORT AND RECOMENDATION

---

On October 16 , 2003 , Petitioner received Magistrate Judge Sherman's Report and Recommendation denying his Writ of Habeas Corpus . For the following reasons , Petitioner objects to the Magistrate's findings pursuant to F.R.A.P.3(a)(3) , and asks the Honorable District Court grant the Writ of Habeas Corpus .


### I. STATEMENT OF THE CASE AND FACTS

Petitioner called the police for help on January 18 , 1999 while being severely beaten by several individuals in the apartment of Mary Robinson the alleged victim in this case . Petitioner yelled "help" into the phone before being cut off . Petitioner was then knocked out by the assailants. Police arrived and took statements from Robinson and other persons concerning the 911 call . Robinson told police she called 911 . She did not .

Petitioner was beaten so badly that when the EMT's arrived they told police he could not be treated , and he must be taken to a hospital emergency room . After going to the hospital and

1

receiving medical treatment for his wounds , Petitioner was taken to jail and charged with two counts of Aggravated Burglary .

## II. PROCEDURAL DEFAULT

Petitioner specifically objects the Magistrate's findings concerning the procedural default of his Application for Reopening of Appeal pursuant to Ohio Appellate Rule 26 (B) . Petitioner filed his 26 (B) timely with the First District Court of Appeals on September 25 , 2000 . When that 26 (B) was denied on April 9 , 2001 , Petitioner had 45 days to timely appeal to the Ohio Supreme Court . Petitioner placed the Notice to Appeal to the Supreme Court in the prison mailbox on May 22 , 2001 . However , the appeal didn't reach the Ohio Supreme Court until May 25 , 2001 , one-day after the 45 day deadline .

Court's will consider the merits of a procedurally defaulted claim in a habeas petition where the petitioner "shows that there was cause for the default and prejudice resulting from the default , or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." **Lancaster v. Adams** (6th Cir. 2003) 324 F.3d 423 , 436 . The Sixth Circuit Court of Appeals has addressed virtually the same issue petitioner presents herein , (a one-day late filing after placing the filing timely in the prison mailbox) in **White v. Curtis** (6th Cir. 2002) 42 Fed. Appx. 698 ; and **Maples v. Stegall** (6th Cir. 2003) 340 F.3d 433 .

In **White** , the petitioner timely placed his papers in the prison mailbox but they did not reach the court until they were

one day late for filing .

The Sixth Circuit applied the federal "prison mailbox" rule and found that because **White** showed good cause for the late filing his claims were not defaulted .

The Court also noted that **White** showed diligence in pursuing his rights and for those reasons , the Sixth Circuit allowed his clams to be heard as if they were timely filed .

In **Maples** , the Sixth Circuit again addressed this issue . **Maples** was proceeding pro se and timely placed his filings in the prison mailbox . However , **Maples** papers did not reach the Michigan Supreme Court until they were filed one day late . The Sixth Circuit held that because **Maples** was proceeding pro se , and could not have hand-delivered his appeal to the Michigan Supreme Court , he was entitled to have his claims presented to the federal court as if they were not defaulted .

In **Mohn v. Bock** (E.D. Mich. 2002) , 208 F.2d 796 , the habeas petitioner raised a claim that was not reviewed by the Michigan Supreme Court because it arrived one day after the 56-day filing deadline . In the subsequent habes action , the district court held that **Mohn** had demonstrated cause to excuse the procedural default because "the papers were no longer in his control" once he gave them to the prison officials prior to the deadline.

Petitioner delivered his appellate filing for the Ohio Supreme Court on May 22 , 2001 . The filings were not due until May 24 ,2001 . Petitioner tried to send his filings by overnight mail but was told by prison officials that inmates at Noble Correctional Institute where Petitioner is incarcerated do not have

this option and only have two to three day mailing options . And because Petitioner was imprisoned at the time he could not drive the filings to the Court himself like any non-incarcerated individual could do . Overnight mail is also available to the public but not to Petitioner . Because Petitioner being incarcerated , and not having one-day mailing options , and the foregoing reasons , he requests review of his claims in this Honorable Court .

If the Court somehow finds the aforementioned authorities do not apply to the Petitioner , he urges that a federal habeas court nonetheless may review a procedurally defaulted claim if the the court's failure to hear it will result in a miscarriage of justice . **Schlup v. Delo** (1995) 513 U.S. 298 , 327 . In the case at bar , Petitioner will establish his innocence and prove constitutional trial error to pass through this "gateway".

### III. CLARIFICATION OF FACTS

Petitioner never threatened to kill the trial judge or prosecuting witness . These facts have been totally misconstrued by reviewing courts and Petitioner is being prejudiced because Petitioner believes his claims have never been reviewed thoroughly because of this reason .

Petitioner shared at an Alcoholics Anonymous meeting in River City Treatment Center that while in the County Jail he was so angry at the trial judge for finding him guilty of Burglary , and angry that the prosecuting witness lied against him at trial , he actually felt like killing them . Petitioner then shared that he did not feel that way anymore after being at River City and

4

away from all the negativity of people on jail . He shared this with the A.A. members expressing his gratitude for the River City program and that it really did work . Petitioner never threatened to kill the judge or prosecuting witness and actually said that he <u>did not</u> feel that way anymore .

The following exchange took place between Attorney Davis and Jason Thalheimer , a Resident Supervisor who was present at the A.A. meeting :

DAVIS : So basically the conversations that his feelings about doing harm to the judge or the prosecuting witnesses , these feelings were at the Justice Center ; is that correct ?

THALHEIMER : That's what he was saying , he said at the A.A. meeting . While at the Justice Center I felt like this . So yes .

DAVIS : And did he tell you Thank God , I'm glad that I'm at River City ?

THALHEIMER : He did say that .

DAVIS : Because I am not thinking of feeling like that anymore ?

THALHEIMER : That's what he said . He said that he's glad he has River City , because he wants to get his treatment and he doesn't feel like this anymore .
(T.p.17 , 18)

Clearly , the Petitioner did not threaten the judge in any way and was sharing only feelings in the past tense . Petitioner was actually saying that River City was working for him , but was violated anyway .

### IV. THE COURT'S ARE FABRICATING WITNESS TESTIMONY THAT IS NOT IN THE RECORD TO UPHOLD PETITIONER'S CONVICTION

### A. FABRICATED TESTIMONY OF MARY ROBINSON

Mary Robinson never said she asked Petitioner to leave her

apartment . These statements are not in the record and are being

fabricated by reviewing court's to sustain Petitioner's convic-

tion . Magistrate is incorrect and unreasonable in his determi-

nation of the evidence . (See R&R pg. 10 & 22)

On page 10 of the Magistrates R&R , he states as follows :

> As cause for his default , petitioner argues that he is
> actually innocent of the crime . (Doc. 8 at 8-9). As the
> Ohio Court of Appeals found , there was ample evidence on
> the record supplied by the victim , Mrs. Robinson , <u>that
> when asked to leave , petitioner remained in her apart-
> ment by the use of force and assaulted the victim .</u> (Doc.
> 3 , Ex. 16 at 2 ; Tr. 21-30 , 39 , 128) .

Mary Robinson <u>never</u> said that she asked petitioner to leave

her apartment . The following is another excerpt from Magistrate's

R&R :

> While the judge acknowledge that this was a confusing case ,
> because the witnesses did have diverse accounts (id.,Tr.127) ,
> the trial judge appeared to believe parts of each witness's
> testimony . He believed that petitioner was there to purchase
> cocaine , as petitioner testified , <u>but remained there after
> he was no longer welcome by wielding a knife and ultimately
> attacking Mrs. Robinson , as Mrs. Robinson testified .</u>
(R&R , pg. 22)

Mrs. Robinson never testified that she asked the Petitioner

to leave her apartment . As a matter of fact , Mr. Robinson's

testimony was quite the contrary . The following is Robinson's

testimony at trial :

PROSECUTOR : Okay . How did you come to meet Matthew Lehrfeld ?

ROBINSON : I came home , me and my sister came to my apartment .

PROSECUTOR : Okay .

ROBINSON : And I came in , and he was in my bathroom . We were
          sitting down in my room drinking beer , and he came
          out of the bathroom with knives in his hands .
(T.p.13) Exhibit A

Robinson's testimony clearly states that she did not know

Lehrfeld and that he broke in to her apartment . Even the prose-
cuting attorney never tried to prove Lehrfeld remained in Robin-
son's apartment by force . Here is an excerpt of his opening
argument :

> Matthew Lehrfeld , the defendant here , did not have any
> permission to be in the apartment of Mary Robinson . That
> the evidence will show that there was an open window that
> Mary Robinson , the victim , indicated was closed , and to
> her best guess , that's the only way he could have gotten in .
(T.p.7)(Exhibit B)

Here , the prosecuting attorney states that Robinson doesn't
know how Lehrfeld got in to her apartment . The following exchange
took place at trial between Robinson and the prosecuting attorney :

PROSECUTOR : He wasn't invited into your apartment ?

ROBINSON : No , he was not .

PROSECUTOR : No permission to be in there ?

ROBINSON : No , he was not invited .

(T.p. 39)

Again , Robinson says Lehrfeld was not let in to her apart-
ment . Why would Robinson lie about letting Lehrfeld into her
apartment ? Why would Robinson lie about knowing Lehrfeld ?
Clearly , from Robinson's testimony about Lehrfeld having broken
into her apartment , she did not say she asked Lehrfeld to leave
her apartment .

Lehrfeld proved he knew Robinson and was let into hr apart-
ment . The trial court agreed with Lehrfeld that he knew Robinson
and she let him in . Lehrfeld can be convicted of evidence that
is in the record . There is <u>no evidence</u> supporting Magistrate

Sherman's Report that Lehrfeld was asked to leave Robinson's apartment .

Robinson lied to police at the scene and told them she called 911 . Robinson is a convicted felon who had been to prison for grand theft . She had over 15 passing bad check convictions . She was arrested after she testified for outstanding warrants . Her children didn't live with her because she was "running from the police."
(T.p. 37 , 46)

Robinson testified that she and her sister were engaged in a 35-minute struggle with Lehrfeld while he had several butcher knives . How did Lehrfeld get beaten severely by two women if he had several butcher knives ?

Robinson's entire testimony was a lie . The trial court believed none of her story . She lied to the Court when asked about an outstanding warrant . When asked about the warrant she denied she had a warrant . But when the judge indicated she would have to be arrested if the warrant was verified , she said the police were going to recite her .

The record is devoid of any statements that Lehrfeld was asked to leave the apartment of Mary Robinson . The record is also devoid that Lehrfeld assaulted Mary Robinson . Lehrfeld was the one who was assaulted and had to be taken to the hospital . Robinson did not . Nor did any of the other women have even a scratch on them .

Furthermore , Robinson committed perjury under oath and the

court's have done nothing about it .

Robinson even admitted at trial that she saw Lehrfeld

calling 911 . Robinson testified at trial :

THE COURT : Who called 911 ?

ROBINSON : I'm not sure of her name . I think her name was Trina .

(T.p. 24 , 25)

Here , Robinson didn't say Lehrfeld called 911 even though

she knew he did . Here is her testimony on that fact :

PROSECUTOR : Okay . At any time , do you recall the defendant ,
            Matthew Lehrfeld , himself , trying to call 911 ?

ROBINSON : Yes .

THE COURT : He was on the phone while you were beating up on him ?

ROBINSON : He had the money in his hand all this time , and he
           was swinging the knife .

PROSECUTOR : And when he called 911 , what did he say ?

ROBINSON : He just said help twice . He yelled for help twice .

(T.p. 38 , 39)

Lehrfeld called 911 in this case . No one else did and that

fact is not disputed . You need two hands to dial 911 on a phone .

Robinson and her sister didn't run out of the apartment until

police were already there . Why wouldn't Robinson and her sister

have run out of the apartment during the 911 call ? The police

took several minutes to arrive at the scene . Why was Lehrfeld

the one who called the police ? If Lehrfeld had butcher knives

why would he have to call 911 for help ?

The fabricated testimony that is not in the record , is

what the Court's are affirming Petitioner's conviction on .

Robinson <u>never said</u> she asked Lehrfeld to leave her apartment and the Court's have abused their discretion by altering witness testimony .

The only marks Robinson had were a"<u>very light</u> laceration on her forearm , and another one on her leg ." (T.p. 64) Petitioner , however , was <u>severely beaten</u> . Linda Wolery , a registered nurse with the Hamilton County Justice Center testified to these facts . The following exchange took place at trial :

WOLERY :- - I examined him soon after his admission into the Justice Center , and he was noted to have <u>very large bruises</u> on the back - - on his back of each leg and lower back . <u>Bruises were severe</u> . <u>They were very severe</u> .
(T.p. 88 , Exhibit C)

Officer Brian Bailey , a corrections officer at the Hamilton County Justice Center also testified about the wounds Lehrfeld had when arriving at jail :

Q : What did you observe ?

BAILEY : At the time he came in , sir , the first thing I observed was from his chest up to his head he had scratches , abrasions , red marks down below his neck . On top of his head , along his forehead , there were several bumps , nickel to quarter size bruises that went on along the back of his head , and on the very back of his head , where he showed me , because he wanted me to tell the nurse , <u>was a large bump approximately the size of a softball</u> , which stuck out probably about a quarter inch , eight of an inch , and had a slight laceration on the back.
(T.p. 92 , Exhibit D)

It is very clear from the evidence that Lehrfeld was severely assaulted . The bruises on his leg and buttocks are consistent from being kicked while he was down . Robinson and the other women had no injuries at all .

### V. POLICE PERJURY

The following is testimony from Kenneth Wells Jr. , Cincinnati Police Officer :

10

Q : Okay . Was there ever a piece of evidence or butcher knife taken into evidence ?

WELLS : - - There were several knives in the apartment , - - we weren't actually sure which knife was used until the complainant pointed it out .
(T.p. 67)

Wells testified earlier that he actually saw the knife .

(T.p. 66) If he saw the knife , why would he need Robinson to point it out ? When asked at trial Wells admitted he <u>did not</u> know it was Petitioner that called police :

Q : Did you know it was the defendant who called 911 ?

WELLS : No , I did not know that .

(T.p. 73)

How can the police say they investigated a crime scene when they don't even know who call 911 ? Here is perjured testimony by Officer Clyde Dubois at Petitioner's trial :

Q : Okay . And and when it says on your report that the defendant found at scene with weapons still on his person , is that accurate ?

DUBOIS : I don't remember a weapon on him at the time . I didn't see a weapon .

Q : That's your handwriting isn't it ?

DUBOIS : That is my handwriting .
(T.p. 78 , at 1-4) (Exhibit D)

Q : And you didn't see a weapon in his hand .

DUBOIS : He had a knife in his hand .
(T.p. 78 , at 16 , 17)

Clearly , Officer Dubois is not telling the truth . Here is another excerpt of his testimony :

Q : And did you talk to Mary Robinson ?

DUBOIS : No .
(T.p. 76)

Q: Did you get that information from Mary Robinson that he had a
   weapon on him ?

DUBOIS : That information came from the sergeant . I didn't talk
         to her at all .
(T.p. 78 , at 7 , 8)

   According to Officer Dubois , he didn't talk to Mary Robinson

at all , and got no information from her about what had happened .

Then he changes his mind :

Q : And did you understand what had happened ? Did you talk to
    Mary Robinson at all ?

DUBOIS : The only thing she told me , gentlemen up there has
         a knife in his hand .
(T.p. 78 , at 22-25) (Exhibit E)

   Now Officer Dubois isn't sure what he saw :

Q : Officer , I want to get this clear . You actually saw a knife
    in the defendant hand ?

DUBOIS : - - The sergeant was standing on that staircase , and
         all I could see was something shiny , and it appeared
         to me as a knife .
(T.p. 79 , Exhibit F)

   Here again Officer Dubois adds :

Q : Okay . And after you cleared him out , there was no officer
    that searched or found a knife at the time ?

DUBOIS : - - We went back into the apartment , had the pictures
         taken , but we didn't recover the knife . We didn't find
         it .I didn't see it . There were knives there , but not
         the particular knife that **she told us he had** .

   Dubois clearly states that they didn't find the knife she

told them he had . This clarifies the fact that (1) police never

saw a knife ; and (2) the police got all their information from

Mary Robinson . If police saw the knife themselves they certainly

would have taken it into evidence . But that did not happen , and

<u>no</u> knives were tagged as evidence .

## VI. PRIVILEGE

During the colloquy with the trial court at the probation violation hearing the Court states to the Petitioner :

THE COURT : I don't act out any anger for Matthew Lehrfeld ,
I don't know who you are but I saw a hopeless addict
in front of me who had gotten in alot of trouble ,
could have been killed , couldn't you ?

A : Yeah .
(Prob. T.p. 43)

The Court states to Petitioner that he could have been killed at Mary Robinson apartment . Because the Court found Petitioner was granted entrance by Robinson , his privilege remained intact even if Robinson (which there is no evidence of) asked Petitioner to leave , because he had privilege "out of necessity ."

Privilege is defined in R.C. 2901.01 (12) . "Privilege" means an immunity , license , or right conferred by law , bestowed by express or implied grant ,arising out of status , position , office , or relationship , or growing out of necessity .

The Petitioner could have been killed if he didn't call the police for help . The trial court also believed that to be a fact . The Petitioner's privilege would not have ceased due to the growing necessity to call 911 .

## VII. SENTENCING

The Magistrate's findings under Ohio sentencing law are incorrect . The Ohio Supreme Court in **State v. Comer** (2003) 99 Ohio St.3d 463 , specifically found that a sentencing court when imposing a nonminimum sentence on a first offender (R.C.2929.14(B)

must make the statutory findings and give its reasons for not

imposing the minimum sentence . Id.

The Supreme Court required that a court must orally make its

statutory findings and state its reasons on the record at the

sentencing hearing . At the time Petitioner was sentenced R.C.

2929.11 (B) provided that :

> "if the offender previously has not served a prison term ,
> the court shall impose the shortest prison term authorized
> for the offense pursuant to division (A) of this section ,
> unless the court finds on the record that the shortest pri-
> son term will demean the seriousness of the offender's con-
> duct or will not adequately protect the public from future
> crime by the offender or others ." Id.

Here , Petitioner , a first-time offender who was originally

sentenced to community control , was given a six-year sentence ;

clearly , this is not the minimum sentence for a felony two bur-

glary .

Here , the trial court did not make its statutory findings

on the record at the sentencing hearing . Therefore , Lehrfeld is

entitled to resentencing according to the statutory guidelines .

### VIII. UNSUPPORTED SENTENCING FINDINGS
### BY THE OHIO COURT'S

The trial court's sentencing findings are incorrect . The

victim did not suffer serious physical harm . The Petitioner

never threatened to kill River City Staff , and that is not why

he was terminated from River City . Petitioner left River City

so he could go to prison and fight his case . There is <u>nothing</u>

in Petitioner's second probation violation (See Exhibit G) about

River City Staff being threatened by Petitioner .

Furthermore , when Petitioner notified staff of his desire

to leave River City , the staff refused to let him leave . Not only did <u>several</u> staff members try to persuade the Petitioner to stay at River City because of the potential prison term he was facing , (two to eight years) but the director of River City came to speak with Petitioner to try to change his mind about leaving . The director himself then told Petitioner that they would have to write his departure up as a probation violation . The Petitioner was approached by at least five or six River City Staff members , each of them telling Petitioner of the possible prison term he was facing , and to reconsider . Petitioner left River City having burned no bridges , and on good terms with staff as well .

This whole issue is completely unfounded and is entirely untrue . Petitioner asks the Court to order a hearing on this matter so he can prove that these allegations has no merit . Petitioner has been prejudiced as well from these unsubstantiated claims .

Further , the Court using a mental illnes diagnosis to sentence the Petitioner to a more severe prison sentence is a violation of the Americans with Disabilities- Act . It is also a violation of his constitutional right to equal protection of the law . Petitioner has been diagnosed with depression . Because Petitioner was diagnosed with depression and was receiving treatment for it should not be a factor in determining a harsher punishment .

### IX. ALCOHOLICS ANONYMOUS

Petitioner's community control was violated by the probation

department when River City staff member Geri Roberts notified
Petitioner's probation officer about what he shared in an Alco-
holics Anonymous meeting . Petitioner asserts that Roberts vio-
lated Petitioner's constitutional rights by revealing this con-
fidential information to Lehrfeld's probation officer and other
River City staff members .

First , Petitioner was sharing about past feelings he had
while at the Hamilton County Justice Center . The Magistrate's
findings that there was a "clear and present danger" are with-
out merit because at the time Lehrfeld shared his feelings with
A.A. members , he specifically spoke in "past" tense . These
facts were established by several River City staff members . The
following is an exchange between counsel and a River City Staff
member at Lehrfeld's probation violation hearing . The staff
member is Kathy Eckerlin , Lehrfeld's case manager :

Q: What did he tell you ?

ECKERLIN : He talked about that when he was in the Justice Center ,
that he was very angry at the judge and very angry at
the prosecuting witness .

Said that he had wanted to do harm to them . And he stated that
he felt like this when he was in the Justice Center . That he
had no longer felt like that , and that he was glad he was at
River City because he knew he needed treatment .

(Prob. T.p. 8 , 9)

Jason Thalheimer's testimony corroborates this which was
mentioned earlier . There was obviously no "clear and present
danger" as asserted by the Magistrate . Furthermore , Petitioner

was completely restrained in a lock-down facility where inmates are not even outside . Lehrfeld had another 3 ½ months to go in the program .

Because Lehrfeld shared these feelings at an Alcoholics Anonymous meeting , these statements were confidential and not subject to disclosure . Lehrfeld didn't tell other staff until <u>after</u> Geri Roberts disclosed the information to staff and the probation department .

The United States Court of Appeals for the Second Circuit has held that Alcoholic Anonymous is treated as a "religion" for purposes of Establishment Clause analysis . **Cox v, Miller** (2nd Cir. 2002) 296 F.3d 89 . The Court held when engaging in Establishment Clause analysis in certain settings A.A. must be treated as a "religion" in the popular sense because some of A.A.'s activities and modes of expression are religious in nature . Several other court's have held the same . The Court found :

> "We are not alone in concluding that A.A.'s activities must be treated as religious for purposes of such  Establishment Clause analysis . Not only did the New York Court of Appeals reach the same conclusion , Griffin , 88 N.Y. 2d at 683 , 649 N.Y.S. 2d at 908 , 673 N.E. 2d at 103 , to the best of our knowledge , no court presented with an Establishment Clause challenge implicating A.A. or a comparable therapy program incorporating religious concepts has reached a contrary one . See Destefano , 247 F. 3d at 407 - Rauser v. Horn , No.98-1538 , 1999 WL 33257806 , at 7 , 1999 U.S. Dist. Lexis 22583 , at 19-20 (W.D.Pa. Nov. 2 , 1999) (finding coerced participation in A.A. or the materially indistinguishable Narcotics Anonymous program as a condition of parole to violate the Establishment Clause ; In re Garcia , 106 Wash. App. 625 , 630 , 24 P. 3d 1091 , 1094 (2001) - - (agreeing that "mandating attendance at [A.A.] classes" -- violates the Establishment Clause but finding no violation where "alternative classes without religious-based content [we]re provided .") .

The statements Petitioner made to the members of A.A. were made "in confidence and for the purpose of obtaining spiritual guidance ." The only reason Petitioner's confidences were made public , is because River City staff divulged the to Petitioner's probation officer .

In <u>Griffin</u> , the court found that "doctrinally and as actually practiced in the 12-Step methodology ,adherence to the A.A. fellowship entails engagement in religious proselytization ."Id. at 683 , 649 N.Y.S. 2d at 908 .

Petitioner asserts that the disclosure of his statements was a violation of his rights , and that A.A. carries the same confidentiality as a cleric-congregant privilege . See Lightman v. Flaum , 97 N.Y. 2d 128 , 134 , (2001) .

Today , every state has enacted the cleric-congregant privilege in some form . Petitioner asserts that the confidential disclosures made to fellow A.A. members violated his rights . Petitioner was sentenced to start River City over , was given a much more restrictive probation , and two years were added as well .

### X. IT WAS REALLY AND INTERESTING STORY , I STILL DON'T KNOW WHAT HAPPENED IN THERE

This is a topic that has never been addressed by both the Ohio courts and Magistrate Sherman . This topic keeps being avoided , and no one will weigh the impact this statement has in the determination of Petitioner's guilt .

The trial court was involved in a colloquy with the Peti-

tioner at his first probation violation hearing . Here is what

the trial court said to Lehrfeld :

> They told me a bizarre story . The whole thing is an amazing story for those who don't smoke crack . <u>It was really an interesting story , I still don't know what happened in there</u> .

(Prob. T.p. 33 Exhibit H)

This statement by itself should cause reversal of Lehrfeld's

conviction . Then the judge offers this :

> Whether all the other stuff was <u>true or not</u> you shouldn't have been there .

(Prob. T.p. 44 , Exhibit I)

In order to obtain a criminal conviction , the defendant

needs to be found guilty "beyond a reasonable doubt". Reasonable

doubt is defined as :

> Proof so convincing that you would rely on it without hesitation in the most important of your own affairs .

(See Exhibit J)

The trial court was Lehrfeld's jury and trier of fact . Those

statements would be like a jury working into a courtroom and

telling a defendant that the proceedings were interesting and we

still don't know what happened , but we will find you guilty

anyway .

None of the Court's will weigh these statement's to Lehrfeld ,

on the record , in the Courtroom , by the trial court . The judge

is saying that he did not know what really happened . Here is

more evidence of that fact :

LEHRFELD : I am supposed to walk into five guys ?

THE COURT : I don't know .

LEHRFELD : How did these four girls beat me up , Judge Niehaus ?
        I was supposed - -

THE COURT : I don't know .
(Prob. T.p. 35)

The trial court told Lehrfeld that he still didn't know
what happened in Mary Robinson's apartment . He also referred
to evidence by saying to Lehrfeld whether the facts were <u>true or
not</u> he should'nt have been there . This is not proof beyond a
reasonable doubt . This is not the kind of information that is
<u>so convincing</u> that a person would rely on it <u>without hesitation</u>
in the most important of their affairs .

## XI. UNSUPPORTED STATE FACT FINDINGS

In Lehrfeld's direct appeal , the First District Court of
Appeals reversed the trial court's finding of a theft offense
citing the record did not support that finding . When a reviewing
court reverses a trial court's findings for unsupported record
claims , the trial court is considered to have abused its discre-
tion . Then the Court of Appeals substituted the theft finding
with its own finding of an assault . This is an excerpt from
that opinion :

> The victim's testimony was that Lehrfeld used force to re-
> main in her apartment without permission and that Lehrfeld
> had the purpose of committing and assault against the victim .

(Opinion at pg. 2 ¶ 2)

Here is Robinson's testimony :

Q : Did you let Matthew Lehrfeld inside ?

ROBINSON : No , I did not .

Q : Did your friend or sister let him inside ?

ROBINSON : No , she did not .

(T.p. 23 Exhibit K)

Here Robinson completely denies even letting Lehrfeld into
her apartment . She further answers :

Q : Have you ever seen this person before this day , on January
     18 th ?

ROBINSON : I seen him walk down Vine , because I remember saying
           he looked like Telly Savales .

Q : And have you ever seen him before that ?

ROBINSON : No .

(T.p. 21 , 22)

Robinson denied ever knowing Lehrfeld at trial . There is no
testimony in the record that she asked Lehrfeld to leave . - -
Furthermore , Lehrfeld had to call 911 or he could have been
killed , as even the trial court believed . (Prob. T.p.43, Ex-
hibit I) . And because Lehrfeld was close to being killed , his
privilege to remain in Robinson's apartment grew out of necessity
to save his own life . R.C. 2901.01 (12) .

Again , Robinson denied letting Lehrfeld in her apartment .
Therefore , she couldn't say she asked him to leave .

The Court of Appeals found that Lehrfeld had the purpose of
committing an assault against Robinson . Here is Robinson's tes-
timony about the assaults :

ROBINSON :
     So finally I hit him in the back of the head with something ,
     I'm not sure what it was , but he fell to the ground . And
     all I know , we just kept hitting him over the top of his
     head while he was down , and suddenly he said help , help ,
     and me and my sister ran out of the door .

Q : Who was saying help ?

ROBINSON : The defendant was <u>screaming</u> for help .

(T.p. 25)

Robinson says right after the 911 call she and her sister
ran out of the apartment . Here is her own testimony :

21

ROBINSON : So we ran down the steps , and at that time , that's
when we seen the woman police officer at the bottom
of the steps at the secure door , holding the door
open to come in .
(T.p. 25 , 26)

Robinson said that police were already at her apartment when she ran out of it . Therefore , she did not run out of the apartment when the Petitioner called 911 . She remained in the apartment while Petitioner was on the floor calling 911 and didn't leave until police arrived . Why didn't Robinson leave the apartment when Lehrfeld fell to the floor <u>screaming</u> for help ? (T.p.25)
Robinson further states :

Q : What were they trying to beat him with ?

ROBINSON : Anything they could grab .

(T.p. 38 )

Q : Now , you said - - what kind of instrument did you have in
your hand and that you used to hit Mr. Lehrfeld ?

ROBINSON : Like I said , I - - we grabbed anything that we could .

Q : You said your sister had a knife ?

ROBINSON : Yes .

Q : What kind of knife did she have ?

ROBINSON : She had a butcher's knife .

(T.p. 48 , 49)

Q : Do you remember a stun gun being involved in wounding Mr.
Lehrfeld ?

ROBINSON : Yes , I do .

Q : Who had a stun gun ?

ROBINSON : I did .

(T.p. 50)

Petitioner was beaten with weapons and was almost killed .
Robinson , according to testimony of Officer Wells , had a <u>very</u>
<u>light</u> laceration on her forearm and leg . Lehrfeld looked like
he had been through a "war" , and suffered <u>very severe</u> injuries .
If Lehrfeld had a butcher knife , and specifically intended to
assaulted Mary Robinson , she would have surely been stabbed .
She testified she was close enough to use a stun gun but suffered
<u>no</u> injuries from Lehrfeld . She even said Lehrfeld was getting
hit while calling 911 , while he was on the floor . And further ,
Robinson didn't run out of the apartment until police had already
arrived . (T.p. 25 , 26)

Robinson lied to police when first questioned . Here id tes-
timony by police at trial :

WELLS : I think you did . I said that she left the apartment .
        She reentered the apartment , and when she reentered
        her apartment , this suspect came out of the bathroom ,
        and that's what caused - - with the knife , and they
        fended him off , <u>and called 911</u> and ran out of the apart-
        ment , <u>as we arrived</u> .

Q : Did you know it was the defendant that called 911 ?

WELLS : No , I did not know that .

The First District Court of Appeals when denying Lehrfeld's
direct appeal stated :

        Although Lehrfeld's testimony conflicted with the victim's
        testimony , we cannot say as a matter of law that the trial
        court improperly weighed the evidence , as testimony of two
        police officers who responded to a 911 call supported the
        <u>victim's recollection</u> of the events .
(Ct.App. Opinion at pg. 2)

The court says that the police officer's testimony supported
the "victim's" recollection of the events . First , the victim
lied to police about calling 911 . She never told police that

Lehrfeld called 911 even though she knew he did . (T.p.38) .
Second , the police just believed everything Robinson told them .
If the police testimony supported Robinson's recollection of the
events , Lehrfeld broke in to her apartment and Robinson didn't
know him . The trial court , court of appeals , and this federal
court all agree that Lehrfeld knew Robinson , and that she did
let him into her apartment . Why would Robinson lie about knowing
Lehrfeld if she was innocent ? The court's knows she lied , and
that her testimony was perjured .

### XIII. HABEAS REVIEW

Where the fundamental liberties of a person are claimed to
have been infringed , court's have a duty to carefully scrutinize
the state court record . The duty of the federal district court
on habeas is no less exacting . Blackburn v. Alabama (1960) 361
U.S. 199 , 208-209 . The Magistrate erred by "baldly assuming
the correctness of the state court's findings without scrutinizing
the record to provide an explanation as to why those findings were
actually , and not just presumably , correct." See Giles v. Schotten
(6th Cir. July 16 , 1999) 1999 U.S. App. Lexis 16902 , at * 19 .
In Parke v. Raley (1992) 506 U.S. 20 , 36- , the Supreme Court
stated that the petitioner's burden of proving that state court
findings are not "fairly supported by the record" is "different"
from and lower than burden of proving constitutional "[in]suffi-
ciency of the evidence under Jackson v. Virginia (1979) 443 U.S.
307 , which requires proof that no rational factfinder could find
the defendant guilty .

In <u>Lahay v. Armontrout</u> (8th Cir. 1991) 923 F.2d 578 , the Eight Circuit rejected the state court findings and order a federal hearing because the findings were based on perjured testimony . In the case at bar , the prosecuting witness committed perjury , and her story was rejected by the court's . Her testimony has been altered by the State of Ohio to sustain Lehrfeld's conviction .

### XIV.  CONCLUSION

If the roles were reversed in this case , and if Mary Robinson called 911 for help after being beaten severely , would Mary Robinson be the defendant ?

If Lehrfeld was asked to leave and didn't , why didn't Robinson say that on the witness stand ? Why did Robinson lie to the police about calling 911 when she knew Lehrfeld had called ? Why didn't Robinson tell police Lehrfeld called 911 ? Why would Robinson lie about knowing Lehrfeld ?

The Court's of Ohio have fabricated witness testimony that is not in the record to uphold Lehrfeld's conviction . The state court's unreasonably determined the facts in light of the evidence presented . This conviction rests on perjured testimony , and a fundamental miscarriage of justice has occurred . Lehrfeld is innocent as proven by the record .

Respectfully submitted ,

MATT LEHRFELD (382-633)

## CERTIFICATE OF SERVICE

        I hereby certify  that a copy of the foregoing was sent
to the Attorney General of Ohio , Jim Petro , 150 East Gay Street ,
Columbus , Ohio by regular U.S. mail on this___23 day of October
2003 .

                                        _____
                                        **MATT LEHRFELD**